William C. GIROUX

v.

Edward SHERMAN, et al.

Civ. A. No. 91–5883.

United States District Court, E.D. Pennsylvania.

Dec. 7, 1992.

Benjamin Naitove and Jennifer Haltzman of Wolf, Block, Schorr and Solis–Cohen, Philadelphia, PA, for plaintiff.

Beth Anne Smith, Pennsylvania Atty. General's Office, Philadelphia, PA, for the eight defendants.

## MEMORANDUM

DALZELL, District Judge.

William C. Giroux, an inmate at Graterford state prison in eastern Pennsylvania, has brought this action under 42 U.S.C. § 1983 against eight correctional officers at the institution.[1] He claims that, on four separate occasions, certain of the defendants beat and tormented him without provocation.

We held a trial without a jury on December 1, 2, and 3. The following will constitute our findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

We have jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3).

*Factual and Legal Background*

The State Correctional Institution at Graterford, Pennsylvania, is a very large prison with a population of approximately 2,600 inmates during the times relevant to this action. According to the testimony of Deputy Superintendent William R. Winder, there are three duty shifts for correction officers, with the 6:00 a.m. to 2:00 p.m. shift having the most officers on duty, approximately 220 of them during the years in question here.

The inmates at Graterford vary from murderers on death row to much more pacific individuals. The prison is therefore divided into several blocks and units, of varying degrees of restrictiveness. "A–Block", for example, is, according to Deputy Superintendent Winder, reserved for well-behaved inmates. Inmates in A–Block have far more privileges, and typically serve in the prison jobs requiring the most trustworthiness.

In order to maintain discipline at the institution, there is a restricted housing unit, which all of the witnesses referred to as the "RHU". Inmates held in the RHU spend 23 out of 24 hours in their cells, and are essentially deprived of all privileges.

It was quite apparent from the testimony that maintaining order and discipline at Graterford is, as one would expect, not an easy or pleasant task. The correctional officers and management of the institution are constantly presented with the harsh realities of coping with a town-size population of convicted criminals.

Given the grim realities of prison life, the Supreme Court of the United States has in recent years affirmed the rule that federal courts are not to engage in the micromanagement of prison discipline. Thus, " '[p]rison administrators ... should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.' " *Whitley v. Albers*, 475 U.S. 312, 321–322, 106 S.Ct. 1078, 1085, 89 L.Ed.2d 251 (1986), quoting *Bell v. Wolfish*, 441 U.S. 520, 547, 99 S.Ct. 1861, 1878, 60 L.Ed.2d 447 (1979).

---

1. The First Amended Complaint asserts two Counts, the second being for assault and battery under state law. At the close of the case, Mr. Giroux's counsel announced that plaintiff's state law claims were withdrawn and this case was submitted exclusively under the Eighth Amendment of the United States Constitution, as applied to the states through the Fourteenth Amendment's Due Process Clause. We also construe this withdrawal to mean that Mr. Giroux has abandoned his claim under § 13 of the Declaration of Rights to the Pennsylvania Constitution ("Excessive bail shall not be required, nor excessive fines imposed, nor cruel punishments inflicted.").

Where, as here, the suit alleges excessive physical force against a prisoner, Eighth Amendment concerns are implicated: " 'the unnecessary and wanton infliction of pain ... constitutes cruel and unusual punishment forbidden by the Eighth Amendment.' " *Whitley*, 475 U.S. at 319, 106 S.Ct. at 1084, quoting *Ingraham v. Wright*, 430 U.S. 651, 670, 97 S.Ct. 1401, 1412, 51 L.Ed.2d 711 (1977). This year the Supreme Court reaffirmed as the standard in such cases that "the core judicial inquiry" is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, — U.S. ——, ——, 112 S.Ct. 995, 999, 117 L.Ed.2d 156 (1992).[2] Or, as Justice O'Connor, the author of the Court's opinion in *Hudson*, put it for the Court in *Whitley*, "The question whether the measure taken inflicted unnecessary and wanton pain and suffering ultimately turns on 'whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.' " *Whitley*, 475 U.S. at 320–321, 106 S.Ct. at 1085, quoting *Johnson v. Glick*, cited in n. 2 hereof.

The resolution of our inquiry under the standards the Supreme Court has set for us necessarily involves the finder of fact in making often difficult credibility determinations. Put another way, these cases typically evolve, as this one has, into a swearing contest between the inmate and his putative antagonists.

As noted, Mr. Giroux claims to have been the victim of unprovoked beatings on four occasions. The first took place early on August 31, 1989, and largely involved Corrections Officer Edward Sherman, though Mr. Giroux claims that he was roughly treated after the primary incident that day by defendant Correctional Officers Wilson and Ligon.

Mr. Giroux asserts that, late on September 13, 1989, he was wantonly beaten by defendant David Sherman, the brother of Edward Sherman, who was also a corrections officer at the time at Graterford.[3] Mr. Giroux also avers that David Sherman forced a long walk back to Mr. Giroux's cell immediately after Mr. Giroux was taken to the infirmary late at night on a stretcher because of possible cardiac trouble. Toward the end of the ordeal, Mr. Giroux asserts that at least three other correctional officers ganged up and beat him, among them defendant David Springer.

Mr. Giroux also claims that in January of 1990, defendant Robert Weikel, a corrections officer, entered his cell and struck him repeatedly in the kidney area. No other corrections officers are implicated in this incident.

Finally, Mr. Giroux asserts that in December of 1990, he was punched in the throat and head by Corrections Officer Krieg and possibly in the presence of Corrections Officer Harris, who is not a defendant in this action.

We will consider each of these incidents in turn, after noting that the parties have stipulated that "[a]t all times, each of the defendants were acting under color of state law."[4]

### August 31, 1989 Incident

Mr. Giroux testified that in August of 1989 he was an inmate in the A–Block at Graterford. He was then a "truck pusher", that is, an inmate whose duty it was to push a large handtruck to deliver breakfasts to locked-in, transient inmates.[5] Mr. Giroux stated that the deliveries of breakfasts started around 6:00 a.m. and, since this was to be his first day on his own on the job (*i.e.*, without a trainer escort), he awakened early, got out of his cell at ap-

---

**2.** The Supreme Court in *Hudson* adopted the locution first used by Judge Friendly in *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir.), *cert. denied sub nom, John v. Johnson*, 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973).

**3.** The Department of Corrections terminated David Sherman's employment in the spring of 1990 for reasons having nothing to do with his conduct toward Mr. Giroux.

**4.** Pretrial Stipulation, p. 3.

**5.** These inmates were transient in the sense that they were typically from other institutions and were housed at Graterford because they had court appearances in the area.

proximately 5:20 a.m. (his cell door having been earlier "cracked" by Officer Sankey), and finished showering and dressing in about ten minutes.

In order to get to the kitchen, it is necessary for a corrections officer to "key-up", which is prison *argot* for the corrections officer to come to a door and unlock it for an inmate. Mr. Giroux testified that he asked Corrections Officer Sankey to "key-up" but was told that he had to ask Officer Edward Sherman. Mr. Giroux testified that Officer Edward Sherman replied, "I'll let you back when I fucking feel like it." In response, Mr. Giroux sat down on the steps and waited for another ten minutes. He then asked another inmate to intercede, but he heard Officer Sherman say to the inmate, "Fuck him."

It is worth pausing here to note that this refusal to allow Mr. Giroux into the kitchen at this time represents telling evidence of the officers' malice toward Mr. Giroux. It is undisputed that "culinary workers" from A–Block routinely were allowed into the kitchen even well before the time of Mr. Giroux's first request. While he was not a cook, it is quite apparent that, to be ready to start deliveries by 6:00 a.m. to the transient prisoners, it is necessary for the truck pusher to get to the kitchen well before the stroke of the hour. Given Mr. Giroux's manifest reliability, as well as his natural desire to show up for work promptly on the first day of his solo activity, Edward Sherman's refusal of Mr. Giroux's request could under these circumstances only have been motivated by spite, at best.

At about 5:50 a.m., Mr. Giroux went to the bridge that straddles the fifty-foot middle of the 692–foot long cavern of A–Block. He pleaded with Officer Sherman, "What do you want. I don't want to be fired", but was told, "If you bother me one more time, I'll write you up." In this context, a "write-up" would mean a lock-up under restrictive conditions. Mr. Giroux testified that he said, "What for? Why? What did I do?"

After repeating "lock up" to the exasperated Mr. Giroux, Officer Sherman pushed Mr. Giroux up against the wall between cells 100 and 102, as a result of which Mr. Giroux said, "Keep your hands off me. I want to see your supervisor." Mr. Giroux then retreated toward the front of the block and started to pound on the door to the main outside corridor where the office of the Day Captain is. The Day Captain is the senior corrections officer in charge of the facility for each shift. Officer Sherman followed Mr. Giroux and, perhaps infuriated at an attempt to go over his head, shoved Mr. Giroux backward and down the steps. Mr. Giroux shouted "Assistance!", but Officer Sherman again shoved and pushed him and kicked him in various parts of the body. Mr. Giroux immediately curled up in agony from this, and Officer Sherman continued to pummel him. Mr. Giroux claims that Officer Sherman stomped on him and continuously struck his kidneys for "what seemed like forever".

Lt. John Gysen arrived a few minutes after he first heard the banging on the door, and said, "What the hell is going on?" Other guards arrived. Mr. Giroux stated, "He assaulted me" and Officer Sherman claimed the opposite. Sherman's accusation was credited on the spot, and, according to Mr. Giroux, he was then removed from the block by Corrections Officers Wilson and Ligon and taken to the RHU.

In a small room at the RHU, Mr. Giroux was unmanacled and stripped in accordance with prison practice before being given a jumpsuit. In this processing room, Mr. Giroux testified that Officer Wilson kicked him in the head after someone tripped Mr. Giroux. Mr. Giroux recalled that Officer Ligon hit him. Mr. Giroux stated that he did not resist because it would have been futile.

The parties have stipulated[6] that Edward "Sherman issued a misconduct report charging Giroux with assault or fighting and refusing to obey an order." Mr. Giroux contested this citation with his own written account (Giroux Exhibit 1), but to no avail.

Needless to say, Officer Edward Sherman's account is considerably more benign

---

**6.** Pretrial Stipulation at p. 2.

from his point of view. Important for our resolution of this disputed testimony is the fact that no one else testified who was in a position to see what actually happened once fisticuffs commenced. Although Officer Sankey was on duty, he was over 300 feet away on the bridge, and the two combatants were in the dim light that still prevailed since most prisoners remained asleep. At the critical time, Officer Sankey claimed that his back was turned to his partner and Mr. Giroux, and therefore he never saw who threw the first punch. We find Officer Sankey's testimony on this point to be obviously incredible in view of the shouted noise that echoed through the vast cavern of A–Block according to both Edward Sherman's and Mr. Giroux's accounts.

With respect to this incident, the testimony of Messrs. Giroux and Edward Sherman was much in congruity until their accounts of actual force. Their testimony radically diverges as to the identity of the aggressor and, to a major extent, the extent of the violence against Mr. Giroux. Viewing all of the evidence, and based upon the demeanor of the two, we are of the view that Mr. Giroux's account is far more credible than Edward Sherman's.

Officer Sherman acknowledged that Mr. Giroux was among the one percent of A–Block inmates entrusted with the job of being a truck pusher.[7] According to the testimony, one is chosen for this task because of one's reliability, and it is easy to see why. The truck pusher pushes a van with, in Mr. Giroux's case, breakfasts for the transient inmates who must leave early each business day for court appearances. The procedure for serving these breakfasts, according to Officer Sherman, was

that each cell door was actually opened, trays were handed to the inmates, and coffee was poured in the inmates' cups while they waited at their open doors. Under these circumstances, it is plain that only the most trustworthy inmates could be allowed to participate in this enterprise which is pregnant with possibilities for mischief at a minimum and disruption at a maximum.

Aside from Mr. Giroux's acknowledged reliability, we also asked Messrs. Giroux and Edward Sherman to stand next to each other, and saw that they are exactly the same height, although Mr. Giroux is heavier. It is simply not credible that an inmate of Mr. Giroux's size, record of docility and demonstrated passivity (see the next two paragraphs) would physically assault a corrections officer, particularly when the inmate has the acknowledged record of trustworthiness that Mr. Giroux enjoyed.[8]

Further, nothing in this record, or in the demeanor of Mr. Giroux, suggests that Mr. Giroux had ever assaulted anyone else or would likely do so. Indeed, Officer Krieg, who first met Mr. Giroux in June of 1988, testified without qualification that he had never seen Mr. Giroux to commit an assaultive act. To the contrary, the defendants' counsel established in her cross-examination of Mr. Giroux that when, in February of 1990, Mr. Giroux was presented with what he regarded as an intolerable situation, he seriously injured himself and not the person who provoked his frustration.

On the witness stand against the unflinching glare of eight Graterford corrections officers, Mr. Giroux was always respectful to his cross-examiner. As he described his reported humiliations, he clearly worked hard to maintain his dignity and

---

7. It is apparent from the testimony that A–Block houses the least demanding, most well-behaved inmates. According to Officer Edward Sherman, many, if not most, of these inmates have been in prison long enough to know about, and comply with, prison rules. According to Deputy Superintendent Winder, who is in charge of, as he describes it, the "care, custody and control" of all Graterford inmates, A–Block is something of an "honor block," though the luster of that status may in recent years have been eroded to some extent. Thus, within this (relatively) docile group, Mr. Giroux's selection as a truck push-

er demonstrates his acknowledged reliability and trustworthiness.

8. The officers cite an incident several months earlier when Mr. Giroux received minor discipline for harboring what they called "contraband". It turns out that such unauthorized "contraband" were some apples and figs and kindred items that Mr. Giroux kept in his cell. This testimony seems to us to be nothing more than grasping at straws, and had much the quality of Captain Queeg's concerns about the missing strawberries in Herman Wouk's *The Caine Mutiny*.

composure, but the reality of his emotional wounds was apparent to us in his doleful eyes.

By contrast, Edward Sherman showed himself in court to be a combative person with a sneering, almost *Clockwork Orange* mien. Even he, however, acknowledged in response to our questions that William Giroux had always been very polite and a hard worker, August 31, 1989 excepted.

In short, we entirely credit Mr. Giroux's account, and therefore find that the beating Edward Sherman administered was in no way necessary to maintain or restore discipline but instead was wantonly inflicted to visit pain and suffering on Mr. Giroux for the sole purpose of maliciously causing harm. To the extent that Mr. Giroux may be regarded as having disobeyed Edward Sherman's order to "lock-up" (*i.e.*, return to his cell) by insisting to be allowed into the kitchen to do his job, such conduct cannot be regarded as justifying the brutality Mr. Giroux described and that we have credited.

With respect to the post-incident rough treatment Mr. Giroux alleged that Officers Wilson and Ligon inflicted on him, we find ourselves in equipoise as to the testimony of the three actors. Although, as counsel argued in his closing, we could infer that Officers Ligon and Wilson would be supportive of their colleague who was allegedly assaulted, we do not find this a sufficiently heavy reed to tip the balance in Mr. Giroux's favor as to these two officers.

*The September 13–14, 1989 Incident*

While still in the RHU because of the August 31 incident, Mr. Giroux testified that on September 13 he felt chest pains and became concerned. It was established through the records of Mercy Hospital in Wilkes–Barre, Pennsylvania, that Mr. Giroux had suffered an "acute myocardial infarction" on or about March 13, 1986. These records are part of Mr. Giroux's medical file at Graterford, according to the testimony of Judith Ritter, R.N., the custodian of such records. The evidence established that Mr. Giroux carried nitroglycerine tablets for his heart condition, and while at Graterford he had been prescribed cardizem, a drug for victims of heart at-

tacks. Mr. Giroux's testimony about his fear of another heart attack is, therefore, amply supported by documentary evidence in the hands of the prison, and negates the testimony of some of the defendants that all of his cardiac concerns were mere "faking".

Because of his persistent chest pain, at approximately 10:00 p.m. on September 13 Mr. Giroux was taken to the infirmary on a stretcher. He was driven there in a van. When Mr. Giroux reached the infirmary, he was given an injection to calm his heart and an electrocardiogram was administered, ultimately suggesting that a heart attack was not in progress. Because no "hard cells" (*e.g.*, of a restrictive nature) were available at the infirmary, it was necessary to return Mr. Giroux to his "hard cell" in the RHU.

At or somewhat before midnight, Mr. Giroux found that he was to be escorted back to the RHU by none other than Officer David Sherman, the brother of Edward Sherman. Mr. Giroux testified that he immediately asked Sgt. Knauer for a different escort, and Mr. Giroux explained his apprehension about being in the custody of the brother of the man allegedly assaulted two weeks earlier. His request was denied, assertedly because the Day Captain, who was not available, had to approve it.

At all times Mr. Giroux was handcuffed and chained around his ankles. Once he left the infirmary, his fears about being alone with Edward Sherman's brother quickly proved to be well-founded. According to Mr. Giroux, David Sherman immediately started jabbing him in the kidney area when they were outside the infirmary.

It is undisputed that Mr. Giroux walked the long distance back to the RHU. David Sherman testified that he tried to get a van, but no one could find the key. Mr. Giroux did not recall even an attempt to get a van, and it was apparent even on David Sherman's testimony that his effort to obtain transportation was perfunctory at best.

As they slowly walked back, Mr. Giroux recalled being struck repeatedly across his shoulders, he thought by a baton. He testified that David Sherman often hit him

and verbally harassed him during the fifteen-minute walk back to the RHU.

When he returned to the RHU, Mr. Giroux was again processed in a small room through the usual procedure, *i.e.*, unmanacled, stripped down, searched, and re-clothed in a jumpsuit. While in the small room, Mr. Giroux testified that David Sherman again assaulted him. He also recalled that Officers Springer, Moran and someone named "Larry" joined in this enterprise.

Shortly after this beating, Mr. Giroux testified that he started to urinate blood. He went on sick call the next day and received medication for the swelling.[9]

David Sherman denies most of Mr. Giroux's testimony, although he agrees that he walked Mr. Giroux all the way back to the RHU late that night. We find Mr. Giroux's testimony to be completely credible against David Sherman's. David Sherman testified that as of September 13 he did not know about the August 31 altercation involving his brother. It is totally incredible that one brother working at Graterford would not know of the other brother's participation in a fight, particularly as Edward Sherman depicted it. While on the witness stand, David Sherman's demeanor was combative, at times even venomous. Considering how he behaved under the constraints of a federal courtroom, we have no difficulty inferring the kind of sadism from David Sherman that William Giroux described.

It is undisputed that David Sherman made William Giroux walk all the way back to the RHU. Mr. Giroux was being treated for heart trouble, and had a documented record of cardiac disease. He had been brought to the infirmary on a stretcher in a van. Forcing Mr. Giroux to walk the long distance to the RHU while manacled, in the late hours of September 13–14, was of a different order of reprehensibility than the August 31 beating. Indeed, unlike Edward Sherman's behavior, which could charitably be understood to have been the product of anger that rapidly got out of control, David Sherman's torment of Mr. Giroux was manifestly the result of a cold and calculated mind. David Sherman's treatment of Mr. Giroux that night thus crosses well beyond the threshold into the sadistic realm that *Hudson* and *Whitley* condemn.

With respect to Officer Springer's conduct in the small room at the RHU, we find that Mr. Giroux has not carried his burden of identifying Officer Springer or anyone other than David Sherman. Given Mr. Giroux's physical state by the time of his return to the small room at the RHU, it is understandable that his memory would not be precise as to who, precisely, hit him or in what particular order.

Mr. Giroux also identified Sgt. Martin Earhart as saying to him, "How dare you cause my officers trouble" and then slapping him in the face. Although Sgt. Earhart was in charge of the RHU in the early hours of September 14, he denies using any force against Mr. Giroux. Although we are inclined to credit Mr. Giroux's recollection on this point, Mr. Giroux did not suggest that Sgt. Earhart's slap was particularly hard and so, under all of the circumstances, we find no actionable conduct under the *de minimis* standard as *Hudson* enunciates it, —— U.S. at ——, 112 S.Ct. at 1000.[10]

---

**9.** We should note here that Mr. Giroux filed an "official inmate grievance" (Giroux Exhibit 2) about this incident. He asked in that document, "must I be both verbally and physically assaulted by CO I *Ed* Sherman's entire family"? The Commonwealth in effect answered "yes". *See* Plaintiff's Exhibit "A", letters of May 16, 1990 to Mr. Giroux and memorandum of the same date to the Acting Commissioner of Corrections.

**10.** The dispute between the Majority and the two dissenters in *Hudson* was over the quantum of harm necessary to make officers' conduct actionable under the Eighth Amendment. The Majority reversed the Fifth Circuit which found the injuries not actionable because "minor".

929 F.2d 1014, 1015. The Court instead held that "the blows directed at Hudson, which caused bruises, swelling, loosed teeth, and a cracked dental plate, are not *de minimis* for Eighth Amendment purposes. —— U.S. at ——, 112 S.Ct. at 1000. On the same page, Justice O'Connor wrote for the Court that *de minimis* uses of force would only be excluded "from constitutional recognition" if not of a sort 're-pugnant to the conscience of mankind' ", *id.*, quoting *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). Unlike the Sherman brothers' conduct, we cannot hold that one slap from Sgt. Earhart "shocks the conscience of mankind," and therefore find it *de minimis.*

*The January, 1990 E–Gallery Incident*

The E–Gallery is an extension of the RHU, though with slightly less restriction. Some time in January of 1990, Mr. Giroux testified that Corrections Officer Robert Weikel entered Mr. Giroux's cell, ordered cellmate Cruz to leave the cell, and then ordered Mr. Giroux to turn around "and assume the position", *i.e.*, to put his hands on the wall and spread his legs. Mr. Giroux testified that Officer Weikel repeatedly struck him in the right kidney area and taunted him to fight back. Mr. Giroux testified that at the conclusion of this visit his kidneys hurt and shortly thereafter he started to urinate blood again.

We find Officer Weikel's denials to be incredible. In combative fashion, he repeatedly denied that the E–Gallery was restrictive housing at all when the evidence shows that, from the inmates' point of view, life in the E–Gallery was virtually indistinguishable from conditions in the RHU. For example, in both places the inmates are restricted to their cells for 23–24 hours. Indeed, the only material difference between the two venues would seem to be the number of officers required to escort the inmates, two in the RHU and one in the E–Gallery.

We also find that Mr. Giroux's account of Officer Weikel's testimony is consistent with what seemed to be the open season on Mr. Giroux that began with the August 31 incident. Since Mr. Giroux was being disciplined—improperly in our view—for assaulting Edward Sherman (rather than vice-versa), it is entirely credible that some officers would feel a license to assert solidarity with Edward Sherman by taking free shots at Mr. Giroux when he was in a state of complete vulnerability.

We have no difficulty finding, based upon the record and upon Officer Weikel's demeanor, that he wantonly and without provocation beat Mr. Giroux in the kidneys, causing urinary tract difficulties that resulted in blood in Mr. Giroux's urine. We find this conduct to be the product of the purest malice.

*The December 22, 1990 Incident*

According to Mr. Giroux, on December 22, 1990, he was on his way to the dispensary to obtain medication. Standing outside the dispensary were Officers Harris and Krieg. Officer Krieg suddenly blocked the doorway, stepped on Mr. Giroux's sneaker, and pounded him in the throat and head.

A fellow inmate, Antonio DeBerry, testified that he saw Officer Krieg punch Mr. Giroux in the left jaw. Shortly thereafter, Mr. DeBerry saw the officer and Mr. Giroux walk around the corner and out of his sight. Mr. DeBerry recalled hearing Mr. Giroux say "Why?" to Officer Krieg.

Officer Krieg's defense is essentially that he was assigned at the time to the Old Hospital Area, which is about 50 feet away from the entrance to the dispensary. Although Officer Harris *was* assigned to the infirmary, Officer Krieg denies being at the dispensary to throw the punches at Mr. Giroux.

On the other hand, Officer Krieg admitted that he had lunch that day in the officers' lunchroom, which is in the infirmary wing. In addition, dispensary records show that drugs were administered to Mr. Giroux in December of 1990, although, for reasons not articulated in this record, the exact date is not written in to this record, which was defendants' Exhibit 8.

Unlike the other three incidents, Mr. Giroux's account, while in contradiction to Officer Krieg's, is supported by that of an eyewitness. We find the testimony of inmate DeBerry to be credible based upon his demeanor and because he had no interest in telling anything except the truth. In this latter regard, the record in this case shows that inmate DeBerry's self-interest would counsel him to have no recollection of the events of December 22, 1990, since it is hard to imagine how his testimony can do anything to improve the quality of his life at Graterford with the very corrections officers, and their supporters on the staff at the institution, who are defendants here.

We therefore find that Officer Krieg punched Mr. Giroux without provocation for wanton and malicious purposes to cause harm, thereby making it unlawful under *Whitley* and *Hudson*. Fortunately, there

was no record of significant injury as a result of this assault.

*Damages*

As the Supreme Court held in *Memphis Community School District v. Stachura*, 477 U.S. 299, 306, 106 S.Ct. 2537, 2542, 91 L.Ed.2d 249 (1986), "when § 1983 plaintiffs seek damages for violations of constitutional rights, the level of damages is ordinarily determined according to principles derived from the common law of torts." Quoting *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 350, 94 S.Ct. 2997, 3012, 41 L.Ed.2d 789 (1974), the Court in *Stachura* held that "compensatory damages may include not only out-of-pocket loss and other material harms, but also such injuries as 'impairment of reputation ..., personal humiliation, and mental anguish and suffering.'" *Stachura*, 477 U.S. at 307, 106 S.Ct. at 2543.

Mr. Giroux's most serious damage is undoubtedly the humiliation and mental anguish he suffered at the hands of the officers who cruelly beat and tormented him. Beginning on August 31, and brutally confirmed on September 13 and later, he lived in constant apprehension of random violence at the hands of Graterford corrections officers.

In addition, however, we heard testimony of Dr. Demetrius Bagley, an expert in urology, who testified that blood in the urine can result from kicks to the kidneys. Dr. Bagley also testified that the effects of trauma such as kicks to the groin and kidneys can be cumulative and exacerbate pre-existing urethral conditions. Mr. Giroux likely had such pre-existing conditions, which in any event resulted in surgery at Montgomery County Hospital to relieve a urethral stricture in March of 1990. Based upon Dr. Bagley's testimony, we find that the brutality Mr. Giroux suffered was related, at least in part, to what required surgery in March of 1990.

We find that Mr. Giroux's damages arising from the August 31 incident, while substantial, will be compensated by $10,000 in damages awarded against Officer Edward Sherman. These damages are not only for the pain, humiliation, and mental anguish suffered in the August 31 incident itself, but also because it became apparent from this record that the false misconduct Edward Sherman issued against Mr. Giroux had a half life that lasted at least until December 22, 1990. That misconduct gave to other defendant corrections officers the license they felt to take free and random shots at Mr. Giroux, and this was a natural and probable consequence that we have no difficulty inferring into Edward Sherman's mind when he wrote the citation.

The sadistic long walk to which David Sherman subjected Mr. Giroux is of another moral order entirely. For his pain, anguish and humiliation, as well as the injury to his kidneys and urinary tract, under all of the circumstances of his chest pains and cardiac condition, Mr. Giroux should receive $10,000 as compensatory damages from David Sherman, but these should not be the only damages imposed on David Sherman.

As noted earlier, we found the behavior of David Sherman on the "long walk" late the night of September 13 or early in the morning of September 14, to have been particularly sadistic, and likely motivated by his desire to avenge his brother. Given the outrageousness of this conduct, as well as the presence of the requisite state of mind under *Smith v. Wade*, 461 U.S. 30, 51, 103 S.Ct. 1625, 1637–38, 75 L.Ed.2d 632 (1974), we believe punitive damages are necessary against David Sherman. As Justice Powell observed for the Supreme Court in *Stachura*, "[t]he purpose of punitive damages is to punish the defendant for his willful or malicious conduct and to deter others from similar behavior." *Stachura, supra*, 477 U.S. at 306, n. 9, 106 S.Ct. at 2542, n. 9 (citations omitted). Palpably, David Sherman acted with the "evil motive" that exceeds the "reckless indifference to the rights of others" § 908(2) the Restatement (Second) of Torts (1979) identifies as the predicate for the award of such damages. The Restatement was embraced as instructive in this appraisal in § 1983 cases in *Smith*, 461 U.S. at 46–47, 103 S.Ct. at 1635–36 and *Stachura*, 477 U.S. at 306, n. 9, 106 S.Ct. at 2542, n. 9. Because we found David Sherman's behavior to have

been outrageous as well as sadistic, we will also award punitive damages in equal amount to the compensatory damages, or $10,000.

■ We find Officer Weikel's January, 1990 blows to Mr. Giroux's kidney area to have resulted in great pain and blood in Mr. Giroux's urine. Given the anguish, pain and humiliation associated with this conduct, as well as its consequences to Mr. Giroux's kidneys and urethra, we find damages of $5,000 against Officer Weikel are necessary to compensate Mr. Giroux.

■ Lastly, we find that although Officer Krieg's blows to Mr. Giroux to have been unprovoked and actionable within the teachings of *Whitley* and *Hudson,* they did not result in any serious physical injury, so we only award $1,000 for pain, humiliation, and mental anguish associated with that unprovoked but short-lived action.

*Conclusion*

■ Although the conduct we have found to have occurred in this case takes a page out of the late Miguel Pinero's *Short Eyes,* we stress again that we understand the difficulty that prison authorities face in maintaining discipline in an inherently difficult environment. As a general matter, therefore, and as the Supreme Court directed in *Whitley,* the behavior of corrections officers is entitled to deference from federal judges reviewing their actions long after the fact. Although we began this enterprise with an abundance of such deference, three days of testimony convinced us that the credibility battle was not a close one, and that beginning on August 31, 1989 Mr. Giroux was tormented by at least four of the defendants—perhaps, for most of them, out of solidarity for their colleague, Edward Sherman. Notwithstanding our determinations herein, we are confident that the great majority of corrections officers at Graterford perform their difficult task with a full appreciation of, and respect for, the Eighth Amendment rights we have found four defendants to have ignored in 1989 and 1990.

We cannot conclude without noting that we were aided immeasurably in resolving this difficult case through the *pro bono* efforts of Wolf, Block, Schorr and Solis–Cohen, which made available the considerable talents of associates Benjamin Naitove and Jennifer Haltzman in the prosecution of Mr. Giroux's case. The work of this firm and these young lawyers in this case is in the best tradition of the bar, and we express our gratitude to them for it.

An appropriate Order follows.

### JUDGMENT AND ORDER

AND NOW, this 7th day of December, 1992, after a non-jury trial in this matter and based upon the findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a) contained in the foregoing Memorandum, it is hereby ORDERED that:

1. Count II of the First Amended Complaint in this action is WITHDRAWN;

2. As to Count I, JUDGMENT IS ENTERED in favor of plaintiff William C. Giroux and against the following defendants in the stated amounts:

a. Edward Sherman in the amount of $10,000;

b. David Sherman in the amount of $10,000 compensatory damages and an additional $10,000 in punitive damages;

c. Robert Weikel in the amount of $5,000;

d. John Krieg in the amount of $1,000;

e. Costs taxed against the foregoing defendants;

3. JUDGMENT IS ENTERED in favor of defendants John Ligon, Timothy Wilson, Martin Earhart and David Springer and against plaintiff William C. Giroux;

4. Finding that William C. Giroux is the prevailing party in this action, his counsel shall, by December 18, 1992, submit affidavits and other documents in support of any claim to a reasonable attorney's fee pursuant to 42 U.S.C. § 1988; and

5. A hearing shall be held at 11:00 a.m. on December 23, 1992, to determine the reasonableness of plaintiff's counsel fee request.